**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| LAVONDA MELCHI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-52-JPK |
| KILOLO KIJAKAZI[1], Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Lavonda Melchi filed the present complaint seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her Title II application for Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. § 405(g). The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. *See* [DE 10]. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). For the reasons discussed below, the Commissioner's decision denying benefits is reversed and the case is remanded for further proceedings.

## BACKGROUND

### A.   PRIOR APPLICATIONS

On August 10, 2013, Plaintiff filed an application for DIB benefits alleging she had been disabled since June 28, 2013. After the application was denied at the initial and reconsideration levels, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security effective July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kijakazi is substituted for Andrew M. Saul as the defendant in this suit.

withdrew her hearing request on July 20, 2015, and then, about a month later, filed another application for DIB benefits, as well as an application for Supplemental Security Income ("SSI"), both of which again alleged a disability onset date of June 28, 2013. The applications were denied at the initial and reconsideration levels. Plaintiff then requested a hearing before an ALJ, which took place on August 8, 2017. On December 14, 2017, the ALJ issued a written decision on both applications finding that Plaintiff was not disabled at any time through the decision date. There is no indication Plaintiff sought judicial review of that decision.

### B. CURRENT APPLICATION

Approximately two years later, on February 2, 2019, Plaintiff filed the DIB application under current consideration, in which she alleges disability beginning December 15, 2017 (one day after the previous unfavorable ALJ decision). Following the agency's denial of her DIB benefits claim at the initial and reconsideration levels, Plaintiff filed a written request for a hearing before an ALJ. The hearing took place on June 18, 2020. Plaintiff was fifty-five years old at the time of the hearing. [AR 34[2]].

The ALJ began the hearing by reviewing Plaintiff's various diagnoses as shown in her medical records, which included degenerative disc disease (DDD), chronic obstructive pulmonary disease (COPD), myocardial infarct and stenting with residual coronary artery disease (CAD), right Achilles tendonitis, degenerative changes of the bilateral hands, right shoulder osteoarthritis, right wrist pain, diabetes, and bronchitis. The ALJ then turned the questioning over to Plaintiff's counsel, who began by asking Plaintiff to describe her problems with her shoulders. Plaintiff testified that she felt sharp pain mostly when lifting "straight out [up] from [her] body," but also

---

[2] The Administrative Record ["AR"] is found in Docket Entry # 18. The page citations are to the Bates stamp numbers in the lower right corner of each page.

when "lift[ing] forward," and that she had "problems with reaching real high." The discussion then moved on to Plaintiff's pain in her left hand, which Plaintiff described as a "pain in [her] middle finger and [her] thumb." Plaintiff testified that she did not "do a whole lot with [her] left hand" as a result. Plaintiff felt the pain when she tried to hold things in one hand while using the other hand, like when she was washing a plate. Plaintiff also testified about her difficulty staying awake during the day and need for a nap. She then discussed her ability to sit, stand, and walk. She testified that she could sit for about 15 minutes before needing to get up, walk for about 200 feet, and stand in one place without moving or holding onto anything for about 5 minutes. She talked about having to bring a lawn chair to watch her grandchildren's ball games rather than sit in the stands because of her need to go back and forth between sitting and standing. She estimated that she could repeat alternating between walking and sitting every 15 minutes for about three to four hours before needing to rest for the remainder of the day. Plaintiff also testified to difficulty bending over to pick something up off the ground due to back and hip pain. Her back and hip caused her "really bad" pain when she bathed her grandchildren.

Plaintiff summarized her "biggest concerns" as being the pains in her knees, shoulder, and hip, and her heart condition. She testified that she does not use any assistive devices like a cane, crutch, or walker, but she did wear an ankle brace for her Achilles heel tendonitis. She has not had any surgery for any of her issues with her knees, shoulder, or hip, nor has she had recent physical therapy (or referrals for physical therapy) for any of those problems.

Regarding her employment history, Plaintiff testified that her most recent job was as a part-time babysitter, which she stopped doing because lifting the baby "got to be too much." Prior to that, she worked as a wire cutter, a job where she "stood and walked to cut the wire, but then [she] could sit any time [she] want[ed] … and fold[ ] washcloths … [for] [a]while." That job ended

because Plaintiff got custody of her grandchildren and it was too expensive for her to hire a babysitter. Before the wire cutting job, Plaintiff worked in a store selling tools, a job that involved running a cash register, waiting on customers, and pulling tools off of the shelf. That job ended when she took another job involving "molding" or "cyber glass parts," where she put parts into a mold machine, ran the machine, and then took the parts out of the machine. Both the job selling tools and the job operating molding machinery involved a combination of walking and sitting.

Following the June 18, 2020 hearing, the ALJ issued an unfavorable decision on Plaintiff's DIB application. The ALJ's decision found that Plaintiff was not disabled at any time from December 15, 2017 through July 1, 2020, the date of the decision. This appeal followed.

## FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or combination thereof, that are severe. If there are no severe impairments, the claimant is not

disabled. If there are, the ALJ determines at the third step whether those severe impairments meet or medically equal the criteria of any presumptively disabling impairment listed in the regulations. An affirmative answer at step three results in a finding of disability and the inquiry ends. Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which is "an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of the inquiry, the ALJ determines whether the claimant is able to perform past relevant work given the claimant's RFC. If the claimant is unable to perform past relevant work, the ALJ determines, at the fifth and final step, whether the claimant is able to perform any work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). A positive answer at step five results in a finding that the claimant is not disabled while a negative answer results in a finding of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1520(a)(4).

## THE ALJ'S DECISION

The ALJ made the following findings relevant to Plaintiff's current arguments:[3]

> 1.      The claimant meets the insured status requirements of the Act through December 31, 2023.
>
> 2.      The claimant did not engage in substantial gainful activity since the alleged onset date of December 15, 2017.
>
> 3.      The claimant has the following severe impairments: mild right joint shoulder osteoarthritis tendonitis/degenerative joint disease (DJD) of the shoulders; degenerative changes of the bilateral hands; chronic obstructive pulmonary disease; history of myocardial infarct with stenting/coronary artery disease (CAD); moderate degenerative changes of the bilateral hips with mild lumbar

---

[3] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

degenerative disc disease (DDD); DJD of the knees; right Achilles tendonitis; and obesity.

4.      The claimant does not have an impairment or combination of impairments that meet or medically equal the severity of a listing impairment.

5.      The claimant has the residual functional capacity to perform light work except as reduced by standing and/or walking of no more than four hours each in an eight–hour workday, as well as the following: occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes, scaffolds; occasionally reach overhead with the bilateral upper extremities; frequently handle and finger with the bilateral upper extremities; and avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dusts, gases, poorly ventilated areas, wet, slippery or uneven surfaces, and unguarded moving machinery.

6.      The claimant is capable of performing past relevant work as a wire cutter and as a tool salesclerk.

7.      The claimant has not been under a disability as defined in the Social Security Act from December 15, 2017 through the date of the decision.

[AR 17-25].

## STANDARD OF REVIEW

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). Apart from a legal error, however, the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The ALJ must articulate an analysis of the evidence to allow the reviewing court to trace the path of reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record, and he or she "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## ANALYSIS

In this appeal, Plaintiff argues that the ALJ's RFC determination did not sufficiently address her limitations in reaching, handling/fingering, or standing/walking, and that the ALJ failed to consider the effect of obesity in combination with her other limitations. Plaintiff also refers generally to error in the ALJ's RFC finding regarding her ability to stoop or crouch, which the Court interprets as being mostly intertwined with Plaintiff's argument regarding the ALJ's failure to consider the effects of obesity on her limitations. Finally, Plaintiff argues that the Vocational Expert ("VE") failed to provide a reasonable explanation for the conflict(s) he identified between his testimony and the DOT.

## I.    RFC FOR REACHING

Plaintiff first challenges the ALJ's RFC determination that she can "occasionally" reach overhead with the bilateral upper extremities." Citing to an x-ray of Plaintiff's shoulder taken in

December 2019, the ALJ found at step two of the evaluative process that Plaintiff suffered from the severe physical impairment of mild right joint shoulder osteoarthritis tendonitis/degenerative joint disease (DJD) of the shoulders. In the portion of her decision discussing Plaintiff's RFC, the ALJ concluded that this severe condition justified a restriction in Plaintiff's ability to perform light work for only occasional overhead lifting. "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at * 5; *see Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) ("'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8–hour workday." (internal quotation marks and citation omitted)).

A Social Security claimant's RFC, as previously noted, is an administrative assessment of what work-related activities the claimant can perform despite her limitations. The RFC "represents the maximum a person can do—despite [her] limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, *3); *see also Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (citing 20 C.F.R. § 404.1545(a)). The RFC determination is a legal decision rather than a medical one, 20 C.F.R. § 416.927(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306, n. 2 (7th Cir. 1995), and it must be supported by substantial evidence, *Pepper*, 712 F.3d at 363.

In support of an "occasional" restriction, the ALJ cited to normal musculoskeletal examination findings in Plaintiff's medical records. But the cited medical records were from appointments Plaintiff had with her treating cardiologist, primary care provider, and urgent care provider, none of which were for the purpose of addressing Plaintiff's osteoarthritis or shoulder pain. Thus, those treating physicians were not asked to evaluate Plaintiff's shoulder pain or the condition causing that pain. For this reason, the Court cannot say that the "normal"

musculoskeletal findings in the physical exam portion of those records are substantial evidence of the absence of musculoskeletal deficits from Plaintiff's osteoarthritis. Moreover, the ALJ cherry-picked general observations in these medical records of no musculoskeletal deficits, while ignoring several notations in Plaintiff's cardiology records acknowledging that Plaintiff reported suffering from arthritic pain. [AR 530, 541, 546, 551, 556]. For these reasons, the cited medical records do not support the ALJ's RFC determination of "occasional" reaching.

That having been said, the ALJ went on to cite other evidence in the record that does support her RFC determination of "occasional" reaching. For instance, the ALJ cited to a consultative examination that took place on May 6, 2019. The ALJ noted that the clinical findings from the consultative examination "were essentially minimal to unremarkable for significant deficit," showing "ROM [range of motion] was full throughout[,] as was full upper/lower muscle strength without muscle atrophy." The consultative examiner acknowledged Plaintiff's complaints about bilateral shoulder pain, but noted that she had "been evaluated by a physician with no plans for intervention or treatment."

The ALJ also discussed the agency determination at the reconsideration level, which the ALJ observed was made following an August 2019 review of the overall evidence. The initial agency reviewer found in May 2019 that no restrictions in Plaintiff's functional ability to lift or reach overhead were necessary, and that finding was affirmed in August 2019 by the agency reviewer at the reconsideration level. The ALJ found that the determinations of the agency reviewers were generally consistent with and supported by the overall evidence. Still, the ALJ imposed an additional restriction not imposed by the agency reviewers for "only occasional bilateral upper extremity overhead reaching." The ALJ explained that she did so to "accommodat[e]" Plaintiff's testimony regarding her shoulder pain. While the ALJ's RFC

discussion acknowledged only Plaintiff's testimony regarding her shoulder pain, the ALJ had cited to the December 2019 x-ray of Plaintiff's shoulder earlier in her decision when she identified Plaintiff's severe impairments at the step two stage of the evaluative process. Those x-rays were taken after the agency reviewers made their decision.

Plaintiff argues that the ALJ improperly discounted her testimony that she suffers from arthritis in both her shoulders, causing her sharp pain primarily with movement related to reaching up. In support of her testimony, Plaintiff cites to a medical record from March 2017 [AR 400 (Ex. C2F)] and one from December 2019 [AR 497 (Ex. C6F)], both showing treatment she received for shoulder pain. The March 2017 record indicates that Plaintiff complained of pain radiating down both arms. She reported that she could "hear popping and cracking in [the] shoulder," that she took ibuprofen or Percocet for the pain but "still has problems," and that she "has to sleep in the recliner due to pain." [AR 400]. A physical examination at the time showed increased pain with abduction. [AR 402]. But Plaintiff ignores that the same examination report also states "lesser tenderness in the subacromial area and down the biceps tendons on both upper arms"; "muscle strength and tone were normal"; and "[n]early full range of motion with both active and passive activity." [*Id.*]. Plaintiff was diagnosed in 2017 with tendonitis of both shoulders, and referred to physical therapy. She also was prescribed naproxen and heat, with directions to return for an injection if the pain was not clearing. [AR 403-404]. Plaintiff points to no medical records, however, indicating any further treatment for shoulder pain until more than two years later, in December 2019. At that time, Plaintiff reported that she had been experiencing right shoulder pain, but no numbness or tingling, for the past six months. [AR 497]. An x–ray was taken, which showed mild osteoarthritis in the joints of the right shoulder. There is no indication in the medical records, however, that Plaintiff

received any medical treatment related to her shoulder following the December 2019 x-ray, nor does Plaintiff argue that she did.

Notably, in the December 2017 decision, the ALJ considered Plaintiff's testimony regarding shoulder pain and shoulder x-rays done in 2016, and restricted Plaintiff's RFC to "frequent[ ] reach[ing] with the dominant upper extremity." *See* [AR 121, 123]. In the current decision, the ALJ had before her Plaintiff's similar testimony about shoulder pain and the March 2017 and December 2019 shoulder x-rays showing only mild right joint shoulder osteoarthritis. The ALJ also considered the consultative examiner's report. Based on this evidence, the ALJ imposed a greater restriction than the previous ALJ (occasional as opposed to frequent overhead reaching). Plaintiff has not pointed to any medical opinion or functional assessment of her physical abilities, or any medical report based on her shoulder x-rays, that supports her argument that the ALJ erred in determining that she could reach overhead occasionally (as opposed to not at all, which would be the next most restrictive level). Although the ALJ did not specifically discuss the shoulder x-rays in reaching her decision regarding Plaintiff's RFC, "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence," particularly where, as here (from her previous citation to it) "there is a strong indication that the ALJ did consider and weigh the evidence [in question] … even though [s]he did not specifically mention [it]." *Diaz*, 55 F.3d at 308. "Although Plaintiff may not agree with the ALJ's [RFC determination of occasional reaching], the ALJ did not cherry pick or ignore evidence." *Hays v. Berryhill*, No. 2:18-cv-129-JVB-JEM, 2019 WL 3183619, at *4 (N.D. Ind. July 15, 2019). The ALJ satisfied her minimal duty to articulate her reasons and make a bridge between the evidence and the outcome as to her RFC determination regarding Plaintiff's limitations from shoulder pain, and the Court will not reweigh

the evidence or substitute its own judgment for that of the ALJ. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

## II.   RFC FOR HANDLING/FINGERING

The Court turns next to Plaintiff's arguments regarding the ALJ's RFC determination that she can "frequently handle and finger with the bilateral upper extremities" [AR 21], a finding that means Plaintiff can use her hands and fingers "during an 8-work day for a minimum of 2 hours and 40 minutes (1/3 of the time) and up to 5 hours and 20 minutes (2/3 of the time)." *Long v. Comm'r of the Soc. Sec. Admin.*, No. 6:14-CV-00036 -ST, 2015 WL 3936465, at *6 (D. Or. June 26, 2015). Plaintiff points out that the VE testified that an RFC of only "occasional," as opposed to "frequent," handling and fingering, when combined with other restrictions in Plaintiff's RFC as determined by the ALJ, would rule out Plaintiff's past work as a wire cutter and tool salesclerk. [AR 61-62]. Thus, the distinction between Plaintiff's ability to only occasionally versus frequently use her fingers and hands "is critical" to the ALJ's finding that Plaintiff was not disabled because she could do past relevant work. *Long*, 2015 WL 3936465, at *6.

The ALJ noted that Plaintiff testified to left hand pain, and specifically the middle finger and thumb, which she said hurt with activities such as cooking, washing dishes, holding a phone, or sweeping the floor. Because of the pain, Plaintiff testified that she limits activities with her left hand, wears a thumb brace, and takes Tylenol. Citing to an x-ray of Plaintiff's left hand taken on December 3, 2019 and another one taken of both hands on December 18, 2019, the ALJ found at step two of the evaluative process that Plaintiff's severe impairments include "degenerative changes of the bilateral hands." [AR 18 (citing Exhibit C-6F, pages 12, 15 [AR 492, 495])]. Then, in her RFC discussion, the ALJ cited to the finding in the May 2019 consultative examination of

"intact fine/gross hand manipulations." [AR 23; *see* AR 452, 457].[4] The ALJ also cited to the agency reviewers' determinations at the initial and reconsideration level [AR 23-24], which found that Plaintiff had no manipulative limitations [AR 77; AR 106]. The ALJ then cited without further discussion the "right hand x-rays," which had been taken after the determinations of the agency reviewers, to justify her decision to vary slightly from those determinations by reducing Plaintiff's RFC to "only frequent vs. constant handling/fingering with the bilateral upper extremities." [AR 24].

In challenging the ALJ's RFC determination in this regard, Plaintiff points to her testimony, as well as the December 18, 2019 x–ray. Plaintiff argues that the x-ray "showed arthritis in all digits and 'severe' CMC (thumb) and middle finger arthritis on the left hand." [DE 20 at 15[5]]. Plaintiff cites to the Mayo Clinic website, which states that "thumb arthritis" (CMC joint) "can cause severe pain, swelling, and decreased strength and range of motion, making it difficult to do simple tasks, such as turning doorknobs and opening jars." [*Id.* at 15 n.5]. According to Plaintiff, her "arthritis in her left hand is so severe that … she is unable to do regular activities, wears a thumb brace, and generally just does not use her left hand." [*Id.* at 15]. But the December 18, 2019 x-ray showed severe CMC and middle finger findings for only the *right* hand. [AR 492].[6]

---

[4] The generally normal musculoskeletal findings, which the ALJ also cited, do not support the ALJ's RFC determination regarding frequent handling and fingering for the reasons already discussed.

[5] Citations to the parties' briefs are to the CM/ECF page numbers at the top right of the page.

[6] The December 18, 2019 x-ray report perhaps unintentionally but nevertheless omitted any severity label to the osteoarthritis in the left hand "first CMC" (e.g., mild, moderate or severe). *See* [AR 492 ("Left hand demonstrates mild radiocarpal, mild scaphoid–trapezium, *first CMC*, mild 1-3 MCP, and mild scattered interphalangeal joint osteoarthritis.") (emphasis added); *compare id.* ("Right hand demonstrates mild radiocarpal, mild scaphoid–trapezium, *severe first CMC*, mild 1-2 MCP, moderate third MCP, severe first interphalangeal, and moderate scattered interphalangeal joint osteoarthritis." (emphasis added)].

Instead, an x-ray taken two weeks earlier on December 3, 2019, which Plaintiff does not cite, indicates "*moderate* first CMC" in the left hand. [AR 495 (emphasis added)]. Other than the one moderate finding in the December 3, 2019 x-ray report, the two left-hand x-rays show only mild degenerative changes. *See* [AR 492, 495]. The December 18, 2019 x-ray as to the right hand, however, showed two severe findings and two moderate findings in addition to other mild findings. *See* footnote 6, *supra*.

Plaintiff makes the additional argument that "the extent of the arthritis and degenerative changes in both hands supports [her] testimony that trying to do things with her hands or hold on to items causes her pain." [DE 20 at 16]. But she points to no medical evidence to support her argument that the overall mild degenerative changes in both hands shown in the x-rays indicate the need for any greater functional limitation than what the ALJ found. *See Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021) (upholding ALJ's decision not to include any manipulative limitations in the RFC despite claimant's reported difficulties using her hands due to carpal tunnel syndrome because no doctor ever found that she had manipulative limitations). The ALJ restricted Plaintiff's RFC to "frequent" fingering specifically citing the right hand x-ray findings, suggesting that the ALJ felt the restriction was justified by the "severe" degenerative changes in that hand only. Plaintiff cites to no evidence that the ALJ failed to consider. While Plaintiff believes the ALJ should have given more significance to the December 18, 2019 x-ray, that alone is not a basis for remand, because the ALJ considered that evidence and explained why she did not see it that way. *See, e.g., Zoch v. Saul,* 981 F.3d 597, 603 (7th Cir. 2020) (ALJ properly concluded that claimant could use her hands frequently (not occasionally) at work where the "record lacked evidence of handling limitations, except for [the plaintiff's] testimony, which the ALJ reasonably found unreliable); *Kristine H. v. Kijakazi*, No. 20 C 4718, 2022 WL 910584, at *5-6 (N.D. Ill. Mar. 29,

2022) (court upholds ALJ's determination that the plaintiff could frequently, as opposed to occasionally, handle and finger bilaterally where the plaintiff testified that her rheumatoid arthritis affected her abilities to type and write but the state agency physicians found no manipulative limitations, the medical records did not show any severe hand symptoms or limitations, and the state consultative examination found normal grip strength and no difficulty in fine and gross manipulation of fingers and hands).

A final word is in order regarding Plaintiff's argument in her reply brief based on the ALJ's finding that she was capable of past work as a wire cutter. Plaintiff cites to the DOT description of that position as requiring numerous actions that "would require someone capable of using their hands proficiently[,] [a]ll seem[ingly] nearly impossible for a person with a thumb brace[7] and little use of one hand." [DE 23 at 6]. The actions that would be required, according to Plaintiff, include feeding and inserting wire into a machine, scraping, dipping, and inserting the ends of the wires into various machine parts, and stringing and wrapping the wire with other materials. [*Id.* at 5].

While this argument has some appeal, it is based solely on Plaintiff's subjective allegations concerning her symptoms. "Subjective allegations of disabling symptoms alone cannot support a finding of disability." *Acevez v. Colvin*, No. 2:13-CV-168-PRC, 2014 WL 3767679, at *11 (N.D. Ind. July 31, 2014). When determining disability, the ALJ must weigh the claimant's subjective complaints against the relevant objective medical evidence, and when no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error. *Dudley v. Berryhill,* 773 F. App'x 838, 843 (7th Cir. 2019); *see also Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (affirming denial of benefits where the claimant "never provided an opinion from a

---

[7] Plaintiff is right-handed. [AR 268]. She testified that she wore "thumb braces." [AR 39].

physician about the conclusion to be drawn from the various MRIs"). Here, Plaintiff points to no doctor's opinion indicating a greater limitation than that found by the ALJ, so the argument must be rejected.

In any event, even if the argument had some merit as to Plaintiff's past work as a wire cutter, Plaintiff's similar argument as to the job requirements for her past work as a tool salesclerk is easily rejected. Plaintiff states that she "presumes" that "one would have to be able to use such tools in order to assist customers when selling them." [DE 23 at 6]. But that presumption is unsupported by any citation and does not, in the Court's view, logically follow from the tool salesclerk job description quoted in Plaintiff's reply brief. In fact, it appears contrary to Plaintiff's testimony that her job involved taking tools off the shelf and ringing them up at the cash register. [AR 48-49; *see also* AR 276 (self-reported job description answering "no" to whether machines, tools, or equipment were used)]. Thus, even if the VE's testimony that Plaintiff could perform her past work as a wire cutter was erroneous, that error was harmless as the VE also testified Plaintiff could perform her past job as a tool salesclerk.

### III.   STANDING AND/OR WALKING

Plaintiff's next argument is that the ALJ's walking and/or standing limitation is not supported by substantial evidence. In support, Plaintiff cites to her testimony at the hearing that she could walk "about 200 feet," stand in one place without moving or holding onto anything for "[m]aybe five minutes,'" sit in a chair for 15 minutes, and repeat multiple times of walking and sitting 15 minutes each, for about three to four hours before needing to rest for the remainder of the day. Plaintiff also cites to the consultative examiner's report, which she contends "opined that she could stand for 15 minutes" and walk a block, as well as medical records she argues support these limitations.

A.     **P**LAINTIFF'S **15-MINUTE** **A**LTERNATING **S**IT/ **S**TAND/**W**ALK **O**PTION

The ALJ found that Plaintiff "has the residual functional capacity to perform light work …

except as reduced by standing and/or walking of no more than four hours each in an eight-hour

workday." [AR 20-21]. Plaintiff argues that the ALJ erred in rejecting her testimony that she

needed to alternate every 15 minutes between "standing, sitting, and walking." The Court agrees

with the Commissioner that substantial evidence supported the ALJ's decision to reject Plaintiff's

15 minute alternating sit/stand/walk limitation.

The ALJ found at step two of the evaluative process that Plaintiff suffered from a number

of severe conditions that might impact her ability to stand and walk, including COPD, coronary

artery disease (CAD) with a history of myocardial infarct with stenting, moderate degenerative

changes of the bilateral hips with mild lumbar degenerative disc disease, DJD of the knees, and

right Achilles tendonitis. But the ALJ noted that Plaintiff's medical records generally contained

no clinical observations of acute distress, and no clinical examination findings or testing

suggesting anything other than conservative treatment for her conditions was required. The ALJ

pointed out that, "with reasonable consistency and in context for ongoing cigarette[ ] smoking, and

other than exacerbations from colds/upper respiratory infections (URIs), [Plaintiff's] pulmonary

exam findings support normal breath sounds." [AR 22 (citing *inter alia* Exhibit C-2F, pages 7, 15,

25 ("no respiratory distress, normal respiratory rhythm and effort, clear bilateral breath sounds and

no rales/crackles [ ] heard")]. The ALJ also noted that medical records showed that "[c]onservative

treatment with use of inhalers and medication is reported effective with clinical assessments for

well controlled hypertension, asymptomatic CAD[,] [and] use of Ventolin for asthma." [AR 23].

The ALJ also noted that medical records showed Plaintiff's hyperlipidemia was well controlled

and she did not experience any chest pain. [*Id.*]. While some medicals records indicated that

Plaintiff had complaints about shortness of breath with exertion, the ALJ observed that the clinical notes cited "this breathing complaint … as essentially stable from usual 'base' symptoms." [*Id.*].

Plaintiff takes issue with the ALJ's comment that her medical records show that her overall treatment for fatigue, shortness of breath, and angina has been conservative, pointing out that she has had ten stents placed and four heart surgeries. But the heart attack occurred in April 2012, and the stenting was done in or around 2007, 2012, and 2013. [AR 124]. Plaintiff's primary care physician indicated that Plaintiff was able to return to work after these events. [*Id.*]. The ALJ's findings were based on more recent medical reports of Plaintiff's heart and lung conditions, which the ALJ accurately noted showed more conservative treatment. Plaintiff also cites to the results of an August 2017 carotid doppler test, which state "0%--49% stenosis noted bilaterally in the internal carotid arteries" [AR 536], as well as a March 2018 treadmill test that was discontinued after three minutes because Plaintiff "became markedly short[ ] of breath and fatigued" [AR 574]. But the ALJ considered this evidence. [AR 23] The August 2017 arterial doppler test reports "[n]o hemodynamically significant stenosis, bilaterally, in the lower extremity arteries." [AR 537]. And the results of the March 2018 treadmill test that Plaintiff failed to complete were marked "inconclusive," with the test being repeated in April 2018. [AR 574]. The cardiology report for the April 2018 stress test reports normal findings. [AR 533; *see also* AR 534-35 (normal echocardiogram report)].

Plaintiff cites *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), for the proposition that the ALJ inappropriately disregarded her need to alternate positions. But the plaintiff's physician in that case had opined that the plaintiff needed to alternate between sitting or standing and lying down. *Id.* at 646. Here, the record contains no similar medical opinion. Plaintiff also cites the consultative examiner's report, which states that Plaintiff can stand 15 minutes per hour. But the

ALJ referred to these limitations as being what Plaintiff "reported" to the consultative examiner. [AR 23]. Plaintiff disputes that conclusion, but regardless of whether Plaintiff is correct, the ALJ's decision contains a fairly thorough discussion of the report as a whole, stating that "the overall clinical exam findings were essentially minimal to unremarkable for significant deficit." [AR 23]. For instance, the ALJ acknowledged the portions of the report on which Plaintiff relies that show "some bilateral hip stiffness with minimal reduced bilateral hip abduction/external rotation range of motion." [*Id.*]. The ALJ then cited to other portions of the report that showed range of motion "was full throughout as was full upper/lower muscle strength without muscle atrophy, negative bilateral straight leg raising, [and] normal gait/posture/reflexes." [*Id.*]. The ALJ also acknowledged the consultant examiner's finding of a "'slight' limitation in coronary function (*i.e.* NYHA Class II)." [*Id.*; *see* AR 453-454; AR 459 ("Coronary artery disease (10 stents) … had MI 5 years ago, being followed by cardiology, last EKG 6 month ago had no acute changes and last cardiac echo was c. 1 year ago and was stable.")]. Finally, the ALJ observed that the consultative examiner's "clinical exam assessment noted that due to deconditioning, the claimant exhibited some use of accessory pulmonary muscles with prolonged expiration; otherwise, results of the PFS were not at listing level severity." [AR 23; *see* AR 456 ("[d]econditioned, shortness of breath")].[8]

The ALJ found further support for rejecting Plaintiff's testimony concerning her need to sit every 15 minutes in the determination of the agency reviewers at the initial and reconsideration levels. The ALJ noted that those findings were based on the prior unfavorable December 2017 ALJ decision, the previously discussed coronary treatment records and testing results, primary care physician's records, and May 2019 physical consultative exam/PFS testing results, as well as a

---

[8] "Deconditioned" refers to shortness of breath from lack of exercise or activity. *See https://mylungsmylife.org/topics/group-1/what-makes-you-breathless/what-happens-when-you-are-not-so-active/* (last visited on 9/21/2022).

May 26, 2019 treatment record showing that Plaintiff was seen at an urgent care center for chest congestion [AR 468-471]; a June 12, 2019 treatment record from Plaintiff's cardiologist showing an exacerbation of COPD [AR 543-547], and an abnormal EKG dated October 16, 2019 [AR 532]. *See* [AR 24, 101-102, 107]. The ALJ also acknowledged more recent medical records following the agency reviewers' decisions, including an April 2020 cardiology record reporting two weeks of intermittent two to three minute episodes of angina and shortness of breath. The ALJ said that one medical record did not change her assessment of Plaintiff's overall ability to walk/stand because of: the short duration for which the symptoms were reported; the notation in the record that Plaintiff was experiencing stress and anxiety when these symptoms appeared; the finding upon physical examination of normal breath sounds; and the ongoing denials for angina/shortness of breath." [AR 23]. In all, the Court finds that the ALJ adequately explained why she rejected Plaintiff's self–reported need for a 15-minute alternating sit/stand/walk restriction.

### B.    THE ALJ'S 4-HOUR STAND AND/OR WALK LIMITATION

Plaintiff also argues that the ALJ fails to adequately explain her finding of a 4-hour stand and/or walk restriction, and the evidence on which that restriction is based.[9] The ALJ reviewed Plaintiff's medical records, the consultative examiner's report, and the findings of the agency reviewers at the initial and reconsideration levels, and concluded from that review that the restrictions in the light work category were generally supported by the evidence. The ALJ then explained her decision to add the additional 4-hour stand and/or walk restriction as follows:

> Given the moderate bilateral degenerative hip x-rays occurring in context for obesity and all other complaints, and for testimony acknowledging a capacity to essentially sustain three to four hours

---

[9] As a reminder, the ALJ said she was "reduc[ing]" Plaintiff's residual functional capacity to perform light work with the "standing and/or walking" restriction of "no more than four hours each in an eight–hour workday." The Court will refer to the ALJ's finding using the shorthand "4-hour stand and/or walk" restriction.

of alternating standing and sitting before need of a break, the undersigned provides additional accommodation in this regard. As to testimony regarding an alleged need to alternate positions, the undersigned again notes an absence of clinical exam findings, or need of more than conservative treatment occurring in context for prior report of cessation of work after obtaining custody of three grandchildren currently ages 10, seven and six. In doing so, the undersigned further limits standing and/or walking for no more than four hours each in an eight-hour workday….

[AR 24].

Plaintiff argues that the above paragraph is "somewhat confusing" because the ALJ seemed to both reject her testimony regarding her ability to walk/stand as unsupported by the medical evidence ("the undersigned again notes an absence of clinical exam findings"), while at the same time claiming to "accommodate" that testimony ("for testimony acknowledging a capacity to essentially sustain three to four hours of alternating standing and sitting before need of a break, the undersigned provides additional accommodation in this regard"). *See* [DE 23 at 3]. The Court agrees that the quoted paragraph is confusing, but not necessarily for the reason Plaintiff gives. It seems relatively clear that the reason the ALJ was imposing the 4-hour stand and/or walk restriction was to provide *some* accommodation for Plaintiff's testimony that she has difficulty walking or standing for too long before needing to sit down. But it is not clear how the ALJ arrived at the conclusion that the 4-hour stand and/or walk restriction is supported by Plaintiff's testimony that she could sustain three to four hours of alternating every fifteen minutes between walking, standing, and sitting. Plaintiff testified that she could sit about 15 minutes, then stand and/or walk another 15 minutes, and that she could repeat this pattern for up to 3 to 4 hours before she would have to stop for the day. Sitting every 15 minutes is an essential part of the 3 to 4 hour limit to which Plaintiff's testified; limiting the walking or standing part to a total of 4 hours with the sitting aspect of Plaintiff's testimony left out entirely does not "accommodate" the limitation to which Plaintiff testified.

While the Court has found that the ALJ's rejection of Plaintiff's 15-minute alternating sit/stand/walk option is not supported by the record, still the ALJ needed to provide an adequate explanation for how she arrived at an "accommodation" for Plaintiff's need to sit during an 8 hour workday with the 4-hour standing and/or walking limitation she imposed. *See Meyerink v. Colvin*, No. 2:13-cv-327-PRC, 2015 WL 773041, at *7 (N.D. Ind. Feb. 24, 2015) ("the ALJ further erred by failing to support his less-restrictive conclusion with any evidence"). "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted b[e] clearly disclosed and adequately sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 94 (1943). "[T]he reviewing court should not have to speculate as to the basis for the RFC limitations." *Moore v. Colvin*, 743 F.3d 1118, 1127–28 (7th Cir. 2014). The ALJ's reasoning in adopting the 4-hour stand and/or walk limitation falls short of Seventh Circuit's command that the ALJ must build a logical bridge between the cited evidence and her RFC. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."). The case therefore must be remanded for a fuller explanation of how the ALJ's RFC accommodated Plaintiff's testimony about needing to sit. But beyond that, the case also must remanded to resolve an even greater ambiguity in the ALJ's 4-hour stand and/or walk restriction than the ambiguity described by Plaintiff.[10]

From the briefing, it appears that Plaintiff interprets the ALJ's walk/stand restriction to mean that 4 hours is the maximum amount of time Plaintiff would be capable of performing each

---

[10] *See Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010) ("In civil litigation, issues not presented to the district court are normally forfeited," but "[i]f the interests of justice require, [the court] may consider the forfeited argument."); *cf. Kline ex rel. J.H.-K v. Colvin*, 11-C-50376, 2014 WL 69953, at *12 (N.D. Ill. Jan. 9, 2014) (citing *Firkins v. Astrue*, 1:09-cv-923-JMS, 2010 WL 3037257, at *4 (S.D. Ind. Aug. 3, 2010) (stating that even an underdeveloped argument is not necessarily forfeited)).

activity (standing or walking) in an 8-hour workday. The Commissioner merely quotes the ALJ's RFC language without discussing its meaning, so it is unclear how she interprets the ALJ's restriction. Plaintiff's interpretation, however, appears to be generally consistent with the case law. *See, e.g., Edmondson v. Colvin*, No. 1:16CV142, 2017 WL 2609405 (N.D. Ind. June 16, 2017) (where ALJ found that the plaintiff had the RFC to perform light work "except that she could sit, stand and/or walk four hours each in an eight-hour workday," court holds that the "ALJ simply identified the maximum amount of time Plaintiff was capable of performing each activity in an eight-hour workday" without stating any "specific sit/stand option"), *vacated on other grounds sub nom. Edmondson v. Berryhill*, No. 1:16CV142, 2018 WL 4091067, at *8 (N.D. Ind. May 24, 2018).[11]

The record demonstrates, however, that the VE testified based upon a different understanding of the ALJ's 4-hour stand and/or walk limitation. Prior to posing the first hypothetical, the ALJ asked the VE whether he was familiar with the Commissioner's exertional classifications, and the VE said that he was. The ALJ then posed the first hypothetical to the VE, which was "an individual who can perform a full range of light exertional work activity," with added restrictions not relevant to the issue at hand. [AR 54]. A hypothetical person who can "perform a full range of light exertional work activity" means a person who can "stand[ ] or walk[ ], off and on, for a total of approximately 6 hours of an 8–hour workday." SSR 83–10, 1983

---

[11] *See also Owen v. Astrue*, 551 F.3d 792, 796 (8th Cir. 2008) (RFC included limitation that the plaintiff could "stand and walk for about four hours each workday"); *Linares Pagan v. Soc. Sec. Admin.*, Civil No. 19-1396 (MEL), 2020 WL 12188416 (D.P.R. Aug. 25, 2020) (RFC limited to light work "with the following additional limitations: she can lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can sit for six hours in an eight-hour workday and stand and/or walk no more than four hours each in an eight-hour workday").

WL 31251, at *6.[12] The VE testified that the first hypothetical person described by the ALJ could

work as a wire cutter and tool salesclerk, two of Plaintiff's past jobs. [AR 55].[13]

For the second hypothetical, the ALJ instructed the VE to assume "all the same limitations

and ability" of the first hypothetical, with the addition that "the individual can stand and/or walk

four hours each in an eight-hour workday"—i.e., the same 4-hour standing and/or walking

restriction the ALJ determined Plaintiff had the residual functional capacity to perform. Before the

VE responded, the ALJ further clarified:

> So, everything else would be the same, but … I'm *reducing* the
> amount of standing and/or walking to four hours each in an eight–
> hour workday.

[AR 56 (emphasis added)]. The VE asked for further clarification, however, stating:

> So, you're saying can stand four, can walk four. So, wouldn't
> necessarily have to sit at all?

[*Id.*]. The AJ responded:

> Well, the statement is that the individual is at range of light work
> activity except that the hypothetical individual can stand and/or
> walk no more than four hours each in an eight-hour workday.

[*Id.*]. Although the ALJ failed to directly address the VE's question about sitting, her response at

this point is generally consistent with Plaintiff's understanding of the limitation. That is, the ALJ

appears to be saying that the light work category is the starting point, which would mean being

able to walk or stand for up to 6 hours a day, but which the ALJ then limits further by saying that

the hypothetical person can never stand or walk for more than 4 hours "each" (i.e., can never stand

---

[12] Sedentary work, by contrast, generally requires periods of standing or walking for a total of "no
more than about 2 hours," and sitting for a total of approximately 6 hours, of an 8-hour work day.
SSR 83-10, 1983 WL 31251, at *5.

[13] The VE ruled out Plaintiff's past work as "mold tender" based on environmental restrictions the
ALJ had imposed in the hypothetical.

more than four hours and can never walk for more than four hours). The VE, however, sought

additional clarification regarding a sitting option, and thus asked the ALJ one more question:

> So, once again, that *wouldn't* exclude light jobs that have fours of
> standing *and* four hours of walking?

[*Id.* (emphasis added)]. And the ALJ replied to that question:

> Correct. It would *not* preclude that.

[*Id.* (emphasis added)].

In answering the VE's last question in the affirmative, the ALJ appears to create a different

meaning for the 4-hour stand and/or walk language than the meaning she ascribe to it in her

previous answers to the VE's questions--one which now varies from the meaning Plaintiff ascribes

to it. According to the final colloquy between the VE and the ALJ, the second hypothetical now

means that the hypothetical person can perform the full range of light work but with the "further

limitation" of no sitting requirement at all so long as the job requires walking for no more than 4

hours and standing for no more than 4 hours. The problem is that what the ALJ described as a

"further limitation" is actually not that if the VE's interpretation is accepted. It then becomes an

*expansion*, i.e. the 4-hour stand and/or walk restriction as interpreted by the VE, whose

interpretation the ALJ confirmed, expands the light work category from including jobs with no

more than 6 hours of either walking or standing to jobs with up to 8 hours of either walking or

standing.

A case addressing a similar internally inconsistent RFC is *Poole v. Kijakazi*, 28 F.4th 792

(7th Cir. 2022). The court began by explaining the exertional categories:

> The Social Security Administration sorts jobs into five physical
> exertion categories: sedentary, light, medium, heavy, and very
> heavy. The agency's regulations set a firm ceiling for the amount of
> exertion needed for a job in a given category. For example, a light-
> work job "involves lifting *no more than* 20 pounds at a time." In any
> case that moves beyond step three of the sequential process . . ., the

> RFC ascertained by the ALJ must specify the highest exertional level the claimant is able to sustain. The RFC represents "the most physical and mental work a claimant can do on a sustained basis despite her limitations." Thus, when an ALJ finds that a claimant is limited to sedentary work, the ALJ has found that "the maximum" of which a claimant is capable is the level set by the regulations.
>
> When we turn to those regulations, we see that "sedentary" jobs may involve lifting no more than 10 pounds and no more than two hours of standing or walking per day. Thus, when the ALJ determined that Poole had a sedentary RFC, she necessarily found that Poole is not able to stand or walk for more than two hours a day.

*Id.* at 795. Similarly, here, when the ALJ said that the individual in the second hypothetical was limited to light work, the ALJ was saying that the maximum that individual was capable of standing or walking is the level set by the regulations. And when we turn to those regulations, we see that "light" jobs may involve walking and/or standing of no more than 6 hours in an 8-hour workday.

The *Poole* court continued:

> Yet the ALJ immediately deviated from that finding when she described Poole's RFC. Instead, the ALJ wrote that Poole could alternate all day long between sitting and standing every 15 minutes. Over the course of the workday, that adds up to only four hours per day of sitting; she would have to stand for the other four hours.

*Id.* at 795-96. Here, the ALJ has done essentially the same thing as the ALJ did in *Poole* when she confirmed the VE's understanding of the second hypothetical. That is, after explaining that the individual in the second hypothetical was limited to jobs involving light work, the ALJ "immediately deviated from that" maximum when she affirmed the VE's statement that the hypothetical individual could both stand four hours *and* walk 4 hours per day: 4 hours standing +

4 hours walking = 8 hours of walking and/or standing, 2 hours more than the 6 hour limit for the light work category.[14]

Turning back to the record, after confirming the VE's statement that the second hypothetical *would* allow 8 hours of standing and walking combined, the ALJ made one final attempt at clarification, in which she returned to her original statement that her intent was to *limit* the ability to perform the full range of light work activity:

> … [J]ust to be clear, as I state the hypothetical, the individual can perform the full range of light work activity *except* the hypothetical individual can stand and/or walk no more than four hours each in an eight-hour workday along with all the other limitations that I indicated previously in the first hypothetical. … I'm just *limiting further* the standing and/or walking activities.

[AR 57 (emphasis added)]. Although in fact *nothing* was actually clear at this point, the VE responded, "Okay, I understand the limitation," and then testified that the person in the second hypothetical could perform Plaintiff's two previous jobs of wire cutter and tool salesclerk. [AR 57].

The second hypothetical can be interpreted to have at least two completely different meanings, and it is impossible to know for certain which of those two meanings the ALJ intended. More importantly, even if the ALJ sufficiently clarified what she meant, the transcript indicates that the VE's testimony that Plaintiff's past two jobs could be performed by the individual in the ALJ's second hypothetical continued to be based on the VE's understanding that the hypothetical meant there was no requirement for any time spent sitting, thus conflicting with a light work

---

[14] Consider by comparison *Baillargeon v. Berryhill*, 359 F. Supp. 3d 172, (D.N.H. 2019), where a medical expert testified that the claimant could sit, stand, and walk all for four hours out of eight, and then further clarified "that he was *not* opining that claimant 'could stand for four hours out of an eight-hour day plus walk four hours out of an eight-hour day, but rather that claimant was capable of a total of four hours of standing and/or walking in an eight-hour day." *Id.* at 176-77 (internal citations omitted; emphasis added).

limitation. This is shown by the subsequent exchange between the VE and Plaintiff's counsel. Plaintiff's counsel offered his own hypothetical of an individual who was limited to "walk[ing] no more than four hours a workday, stand[ing] no more than four hours in a workday." [AR 60]. The VE responded by observing that Plaintiff's counsel's hypothetical was the same as the ALJ's second hypothetical. [AR 61]. Plaintiff's counsel agreed as to the stand/walk part of the hypothetical but said he was adding an additional limitation of only occasional fingering and handling. [*Id.*]. With these additional manipulative limitations, the ALJ testified that the individual in Plaintiff's counsel's hypothetical could not perform Plaintiff's past jobs, explaining that the reason for this turned on the VE's interpretation of the 4-hour stand and/or walk restriction. As the VE explained, the person would be limited to 4 hours of standing and then would have to walk the remainder of the day, which would interfere with the person's ability to do the jobs in question. In other words, according to the VE's testimony, the absence of any sitting requirement in the hypothetical meant that the jobs could not be performed with the stated RFC. Thus, the VE's testimony in response to Plaintiff's counsel's questions clearly shows that the VE continued to understand the 4-hour stand and/or walk restriction to mean an expansion rather than a limitation on the light work category. In all, the transcript of the VE's testimony seems to indicate that everyone – and by "everyone" the Court means the ALJ, the VE, and Plaintiff's counsel[15]— seemed to accept without question that the ALJ's 4-hour stand and/or walk limitation included no sitting requirement at all and allowed for 4 hours of standing *and* 4 hours of walking, for a total of

---

[15] Plaintiff, as opposed to her counsel, is not included in this category, as she spoke up at this point to ask about a lack of a sitting option, expressing her concern about the 4-hour stand and/or walk limitation for this reason. The ALJ directed Plaintiff's counsel to respond to Plaintiff's concern by posing an appropriate question to the VE. Plaintiff's counsel then asked the VE a totally unrelated question about off-task time rather asking a hypothetical that included a sit option. [AR 63].

8 hours of walking and/or standing. The apparent contradiction between that limitation and the ALJ's light work limitation was never addressed.

If the ALJ intended her 4-hour stand and/or walk limitation to mean 4 hours of standing *and* 4 hours of walking, with no option to sit, then the RFC finding of a light work restriction with this stand/walk limitation is internally inconsistent and cannot stand. *See Poole*, 28 F.4th at 795. In the written decision, however, the ALJ used the language "as reduced by," which arguably makes clear that the ALJ did *not* intend for the 4-hour stand/walk limitation to include a job that would allow a total of 8 hours of walking or standing. Yet, what the ALJ intended and/or how the RFC is described in the written decision do not change the fact that the VE's testimony in response to the second hypothetical construed the 4-hour stand and/or walk limitation differently and in such a way that the hypothetical contained an internal inconsistency. The VE's testimony therefore was fatally flawed and of no evidentiary value for purposes of the ALJ's step 4 finding. As a result, the ALJ could not rely on that testimony in finding at step 4 that Plaintiff could perform her past two jobs as a wire cutter and as a tool salesclerk. For these reasons, the ALJ's finding that Plaintiff can perform past relevant work is not supported by substantial evidence and must be reversed. *See Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008) ("Overman also persuasively argues that the ALJ's ruling is not supported by substantial evidence because it is premised on the VE's 'flawed' testimony."); *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) ("A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.").

## IV.   CONFLICT BETWEEN VE TESTIMONY AND THE DOT

Plaintiff's final argument is based on SSR 00–4p, which provides that, before relying on the testimony of a VE to support a disability determination, the ALJ must identify and obtain a

reasonable explanation for any conflicts between the VE's testimony and the information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupational Titles (SCO). *See* SSR 00–4p, 2000 WL 1898704, at *1 (S.S.A. Dec. 2000); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) ("The Ruling's language unambiguously sets out the ALJ's affirmative duty" to raise this issue at the hearing).

The ALJ asked the VE about any inconsistencies, and thus satisfied her duty to inquire. The VE responded as follows:

> Well, … we do have a limitation of only occasional reaching overhead, and these jobs do require frequent reaching per the SCO, but in my opinion, not more than occasional work overhead. So, that's in conflict, I would say. I based that on my education, research, training, and experience in job placement of vocational rehabilitation as well as … specific limitations on the amounts of standing and/or walking that both [the ALJ] and [Plaintiff's] Counsel have asked about. I think that will be all.

[AR 62]. The ALJ accepted this response without asking any further questions. Plaintiff argues that the VE's reference to his "education, research, training, and experience in job placement of vocational rehabilitation" is conclusory and does not satisfy the requirements of SSR 00–4p. The argument, however, is undeveloped with only a single case citation. [DE 20 at 17]. Moreover, arguably Plaintiff abandoned the issue by not responding to the Commissioner's arguments in her reply brief. *See Kate J. v. Kijakazi*, No. 3:21-CV-50334, 2022 WL 3290718, at *2 n.3 (N.D. Ill. Aug. 11, 2022) (failure to respond to an argument in a response brief results in waiver). But the Commissioner's treatment of the issue in her response brief was itself somewhat cursory. The Commissioner also made an alternative argument in a footnote that, because the VE testified (and the ALJ so found) that Plaintiff was capable of performing her past jobs as wire cutter and tool salesclerk "as actually performed," any failure to explain the DOT conflict was harmless. But that argument too was conclusory and without citation to legal authority. [DE 22 at 11]. *See Vang v.*

*Saul*, 805 F. App'x 398, 403 (7th Cir. 2020) (arguments mentioned "fleetingly" that "are underdeveloped or lack any citations to authority" are waived).

Given the state of the record on this issue, the Court is reluctant to resolve it in this appeal. To begin with, the question is complicated. As Judge Cherry explained in response to a similar argument that was made: "Though the briefing elides them, this objection raises two distinct questions under [ ] Ruling [SSR 00-4p]. First, did the ALJ 'elicit a reasonable explanation for the conflict'? And second, if so, did the ALJ's decision provide an adequate explanation of how he resolved the conflict?" *Meyerink,* 2015 WL 773041, at *10 (internal citations omitted). Further, as Judge Cherry also explained, "[t]here are … two separate sources of law at play regarding what qualifies as adequate VE testimony." *Id.* at *12. Finally, the VE appears to have alluded to two separate conflicts, one regarding the overhead reaching requirement and the other related to "the specific limitations on the amounts of standing and/or walking." [AR 62]. Added to all these variables is the Commissioner's footnote harmless error argument based on the ALJ's alternative finding that Plaintiff's RFC allowed her to do her past jobs as they were actually performed.

The Court will not attempt to sort through this quagmire when neither party has done so. Nevertheless, a few observations are in order in hopes that errors will not be duplicated on remand. First, the ALJ's decision implicitly, but not expressly, acknowledges the existence of a conflict in the VE's testimony with the statement that, "[i]n accepting the testimony of the vocational expert undersigned notes the expert's experience in the vocational field, which includes actual placement of individuals into work settings." [AR 25]. Because the finding is implicit rather than explicit, the ALJ does not describe the conflict or conflicts that the VE identified or explain the ALJ's rationale for resolving those conflicts in favor of the VE's testimony. SSR 00–4p provides that when the vocational evidence is not consistent with the DOT, "the adjudicator must resolve this conflict

before relying on the VE … evidence to support a determination or decision that the individual is or is not disabled," which *includes* the requirement that the ALJ "explain in the determination or decision how he or she resolved the conflict." SSR 00–4p, 2000 WL 1898704, at *4. An ALJ is required to "minimally articulate" the reasons for his decision. *Dixon,* 270 F.3d at 1176. "If decision … 'is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). Without even identifying what conflicts the ALJ determined there were in circumstances where the VE's testimony is ambiguous as to whether he was identifying one or two separate conflicts, the Court cannot say that the ALJ satisfied the minimal articulation requirement.

The ALJ's conclusory step 4 analysis is particularly a problem insofar as the VE's ambiguous testimony about a possible conflict with the 4-hour stand and/or walk requirement is concerned. The Seventh Circuit has suggested that "[b]ecause the DOT does not address the subject of sit/stand options, it is not apparent that [a VE's] testimony [can] conflict[ ] with the DOT" on that point. *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008). But the VE appears to have thought there was a conflict. If the conflict he had in mind is related to a 4-hour total standing or walking limitation, as Plaintiff appears to construe the ALJ's RFC finding, then he should have first explained what that conflict was, and then given his reasons for concluding that Plaintiff's former jobs fell within the subset of light work jobs that requires no more than four hours total of standing or walking. *See, e.g., Fagan v. Berryhill*, No. 2:16-cv-2051, at *1 (E.D. Cal. Mar. 15, 2018) ("Because VE testimony on whether there were light jobs plaintiff could perform with a stand/walk limit of 3-4 hours was inadequate, and the ALJ did not seek clarification, this matter is remanded for further administrative proceedings.").

But if the VE instead had in mind the *8 total hours* of walking or standing option about which he seemed to have testified, then the conflict he was alluding to may have been a conflict between his testimony and the SSA's definition of light work, as discussed previously, rather than a conflict between his testimony and the DOT. In that situation, SSR 00-4p makes clear that, "[a]lthough there may be reason for classifying the exertional demands of an occupation (as generally performed) differently than the DOT (e.g., based on other reliable occupational information), *the regulatory definitions of exertional levels are controlling*." SSR 00–4p, 2000 WL 1898704, at *3 (emphasis added). SSR 00-4p gives an example: "if all available evidence (including VE testimony) establishes that the exertional demands of an occupation meet the regulatory definition of 'medium' work, the adjudicator may not rely on VE testimony that the occupation is 'light' work." *Id.* Although it is impossible to tell from the ALJ's conclusory step 4 findings, the ALJ could have thought that she could resolve the conflict previously discussed between her light work RFC and the 4-hour standing and/or walking limitation to which the VE testified by relying on the VE's "experience in the vocational field." But SSR 00-4p makes clear that neither the ALJ nor the VE may deviate from the regulatory definition of light work as requiring no more than 6 hours of combined walking and standing in an 8-hour work-day.

As to the conflict identified by the VE between his testimony that Plaintiff's past jobs only required occasional overhead reaching versus the DOT's definition that includes frequent overhead reaching, the Court recognizes that "the relevant case law suggests that something more than a conclusory statement is required" to provide a reasonable explanation for the conflict as required by SSR 00-4p. *Thomas v. Berryhill*, No. 4:16-CV-94-TLS, 2018 WL 5093898, at *8 (N.D. Ind.

Oct. 18, 2018).[16] The issue is not totally free of doubt, however. *See, e.g., Mitchell v. Kijakazi,* No. 20-2897, 2021 WL 3086194, at *2 (7th Cir. July 22, 2021) (the VE can explain the apparent inconsistency by providing more specific information about a job than the DOT based on the expert's experience); *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002) (the VE is "free to give a bottom line, provided that the underlying data and reasoning are available on demand").

In any event, the Commissioner's harmless error argument would provide a solution for avoiding having to resolve the issue. That is, the DOT and SSR 00-4p would not be relevant to the VE's alternative testimony (on which the ALJ also relied) that Plaintiff could perform her past work as she had actually performed the jobs, not as they are generally performed. "When a VE

---

[16] *See, e.g., Brown v. Colvin*, 845 F.3d 247 (7th Cir. 2016) (finding the issue "close" but ultimately agreeing with the plaintiff that the VE's testimony was insufficient, stating that, "[w]hile the vocational expert's opinion does not appear conclusory—after all, she referenced her personal experience with placing individuals in sedentary greeter positions—the record does not indicate that her knowledge on the topic exceeds that of the DOT authors, or that her opinion is informed by another reliable publication," and that, "because the ALJ declined to pose any follow-up questions on the subject, [the court] [is] left without any additional information about the approximate percentage of the greater positions that can be performed in a sedentary manner," explaining that if it was "closer to 9%" than 95%, that "would be an insufficient ground for trumping the DOT"); *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014) (stating that the VE "didn't explain how impressions from unspecified past experience and 'knowledge' could enable him to determine numbers of particular jobs" or "reveal what surveys he had relied upon and what they had shown"); *Hill v. Colvin*, 807 F.3d 862, 871 (7th Cir. 2015) (Posner, J., concurring) (citing *Herrmann* in observing that the VE's reliance on "his 'own experience' for his conclusion that the applicant" could perform certain work was insufficient); *Halun v. Colvin*, No. 15 C 10981, 2016 WL 4492396, at *7 (N.D. Ill. Aug. 26, 2016) ("[T]he VE failed to describe the experience that allegedly formed the opinion …right after she said her testimony was based on her experience. As a result, there is no explanation for the conflict; not one that satisfies the Seventh Circuit's logical bridge standard in any event." (internal citations omitted)); *see also Meyerink,* 2015 WL 773041, at *13 (finding that the VE's testimony satisfied SSR 00–4p's "reasonable explanation" requirement because he "went beyond simply saying that his conclusions were based on his experience" and instead included "examples" of placing individuals in the jobs he mentioned, observing those jobs, and analyzing them); *Baillargeon*, 359 F. Supp. 3d at 183-84 (although the VE mentioned her "professional experience" she offered no explanation for how or why the jobs she said the claimant could do could be performed by a person who did not meet the DOT requirements for the job).

34

testifies that a claimant can still perform her past work as it was actually performed, the DOT becomes irrelevant." *Hernandez v. Astrue*, 277 F. App'x 617, 625 (7th Cir. 2008). But the argument turns on whether there is evidence to support its factual basis, i.e. that Plaintiff's past jobs as performed required only occasional (versus frequent) overhead reaching. The VE testified that Plaintiff could perform her past work "as classified and customarily done and *to the best of my knowledge* as performed in this case." [AR 55 (emphasis added)]. "[T]he validity of that testimony still depends on whether the [VE] accurately [understood]" how Plaintiff performed her past work. *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). The VE did not testify about how the jobs were performed by Plaintiff insofar as the requirement for overhead reaching is concerned, so it is not clear what facts he was relying on for his testimony. *Compare Hernandez*, 277 F. App'x at 625 (noting that "[t]he VE twice unambiguously explained that her testimony on this issue was based on [the plaintiff's] statement that she was permitted to sit or stand while sorting"). And as far as the Court can tell, Plaintiff was neither asked nor testified to any facts that would have informed the VE on that issue. Further, from what the Court can tell, the items from the record reviewed by the VE prior to his testimony also did not include any such information. *See* [AR 53]. According to the Commissioner, "Plaintiff did not indicate that she was required to do any reaching in these positions." [DE 22 at 11 n.3]. Again, however, it does not appear that Plaintiff was ever *asked* about how much reaching overhead was involved in those past jobs. *See* [AR 47-49]. The VE did specifically ask whether Plaintiff had to do any climbing to get tools when she was a tool salesclerk, and Plaintiff responded she did not. [AR 53]. But climbing and overhead reaching are two different things, so this testimony does not clarify whether Plaintiff performed that job with only occasional overhead reaching.

In sum, on remand, the ALJ should explain what she meant by the 4 hour "each" standing and walking limitation, and articulate with clarity how she arrived at that limitation based on the evidence. The ALJ should specifically discuss whether, if Plaintiff has an RFC for light work, there should be a further limitation of no more than 4 hours each for standing and walking, but also include a specific total stand and walk limitation that is consistent with the light work category of work (which would allow a maximum of only 6 hours of either standing or walking). The ALJ should then elicit supplemental testimony from the VE as to the ability to perform the past relevant work with those limits clearly defined, ensuring that the VE understands the limits correctly. The ALJ also should ask the VE to clearly identify any conflicts with the DOT, and the ALJ should clearly identify the conflicts in her decision and then explain how she resolved those conflicts in accordance with SSR 00-4p so as to allow a reviewing court to understand the basis for the ALJ's decision. In addition, or else in the alternative, should the ALJ wish to rely at step 4 on how Plaintiff actually performed her past jobs, the ALJ should ensure that any VE testimony concerning Plaintiff's abilities to perform her past jobs as those jobs were actually performed by her has factual support in the record regarding how Plaintiff actually performed those past jobs, which may involve further questioning of Plaintiff regarding the extent to which her past jobs, as performed by her, required overhead reaching.[17] Any further arguments Plaintiff raises in her brief that are not discussed in this opinion, such as her meager discussion of the obesity issue and/or the ALJ's RFC findings for stooping and/or crouching, can be presented to the ALJ on remand.

---

[17] The Court would add one more potential clarification, which relates to the VE's testimony that Plaintiff's past work as a tool salesclerk was "skilled work, SVP 5." [AR 54]. This appears to be in conflict with Plaintiff's testimony and record submissions about the work she actually performed.

## <u>CONCLUSION</u>

Based on the foregoing, the Commissioner's final decision is **REVERSED AND REMANDED** for further proceedings. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Plaintiff and against Defendant.

ORDERED this 26th day of September 2022.

<u>s/ Joshua P. Kolar</u>
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT